829 So.2d 640 (2002)
Jacques F. LEVY and Leonie S. Levy
v.
Russell D. LEVY.
No. 2002-CA-0279.
Court of Appeal of Louisiana, Fourth Circuit.
October 2, 2002.
*642 Stephen C. Resor, Sullivan, Stolier & Resor, New Orleans, LA, for Plaintiff/Appellee.
LeRoy A. Hartley, LeRoy A. Hartley & Associates, New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge STEVEN R. PLOTKIN, Judge, MIRIAM G. WALTZER, Judge and PATRICIA RIVET MURRAY).
MIRIAM G. WALTZER, Judge.

STATEMENT OF THE CASE
Jacques F. Levy and his wife, Leonie S. Levy, filed suit on 22 August 1995 against their grandson, Russell D. Levy (Russell), whom they had named their attorney-in-fact by Acts of Procuration executed on 2 February 1994. Mr. and Mrs. Levy alleged that Russell made numerous gifts of their property to himself, to his wife[1], Elizabeth Levy, and to their marital community, in violation of the explicit terms of the Acts of Procuration. Mr. and Mrs. Levy sought an accounting and recovery of that portion of their funds that Russell *643 diverted to himself and his wife and sought a writ of sequestration applying to certain accounts in the names of Russell and Elizabeth Levy. Mr. Levy verified this petition.
By Supplemental and Amending Petition filed on 29 March 1996, the Levys added Russell's wife, Elizabeth B. Levy, as a defendant and alleged, inter alia, that Russell was compensated for his services as attorney-in-fact under the Acts of Procuration.
On 10 October 1996, Russell filed answers to the original petition and to the supplemental and amending petition. Russell admitted his grandparents' right to an accounting and alleged that the documentation had been given to their attorney. He pled that he had a legal right to make the transfers of which his grandparents complained. Russell prayed that the sequestration issued in the case be recalled.
Discovery proceeded. Russell claimed he could not be deposed because of the pendency of criminal charges arising out of his administration of his grandparents' assets. The trial court by judgment of 17 March 1997 dismissed Russell's motion to quash notice of deposition, reserving his right to object to any question he believed violated his privilege against self-incrimination. The trial court by judgments dated 11 and 17 March 1997, respectively, quashed subpoenas and subpoenas duces tecum issued to Mr. Rosen and Dr. Jay Levy. This Court denied Russell's application for supervisory writs on 30 May 1997. The Louisiana Supreme Court also denied writs.
On 6 January 1997, by consent order, the parties agreed that none of the documents in the possession of counsel or their clients that in any way relate to the relationship between Mr. Rosen and the firm of Locke Purnell Raine Harrell would be destroyed until further court order or termination of the litigation and that no documents in Russell's or his attorney's possession relating to any action taken by Russell in connection with the matters at issue in the case would be destroyed pending further court order or termination of the litigation. The court ordered that all parties and counsel preserve all documents currently in their possession relating in any manner to either the exercise of functions by any attorney-in-fact under a procuration issued by Mr. and Mrs. Levy or any other documents relating to the allegations of the lawsuit until further court order or final resolution of the litigation.
On 29 July 1997 Mr. and Mrs. Levy filed a motion for judgment on the pleadings and/or for summary judgment ordering an accounting and ordering Russell to return all assets he transferred to himself and to Elizabeth Ballew (Levy). By judgment dated 14 November 1997 the trial court ordered Russell to render an accounting within sixty days of the judgment; ordered Russell to place into the registry of the court any funds presently under his control or transferred by donation to himself or others from his grandparents' estate; denied the other relief requested in the motion for judgments on the pleadings and/or for partial summary judgment; ordered Mr. Rosen, the curator appointed by judgment of the trial court in "Interdiction of Jacques F. Levy and Leonie S. Levy", No. 97-5381 on the docket of the Civil District Court for the Parish of Orleans, to be substituted as plaintiff in the instant proceedings.
Mr. Rosen, on his motion, was substituted as party plaintiff by order dated 15 January 1998. On 21 January 1998 the trial court granted Russell's motion to allow his accounting to be filed under seal. On 27 March 1998 Mr. Rosen moved to *644 compel Russell to file the court-ordered accounting. Russell resisted the motion on self-incrimination grounds. The trial court by judgment dated 16 June 1998 ordered that the accounting previously filed under seal be provided to Mr. Rosen, as curator, to his attorney, to Dr. Jay Levy and to Dr. Russell Levy as undercurators, and undercurators' counsel. The parties were ordered not to communicate the information to any third persons except by court order after a contradictory hearing with notice and service on all parties. Mr. Rosen moved to include Mr. Mauer, as the estates' Certified Public Accountant, in the group allowed to view the accounting filed under seal by Russell.
Upon Mr. Levy's death, Mr. Rosen was substituted as plaintiff in his capacity as Testamentary Executor of Mr. Levy' succession by court order dated 9 December 1998.
On 2 March 1999 Russell filed a third party demand and petition for damages for false arrest and malicious prosecution against Mr. Rosen, the law firm of Locke Purnell Raine and Harrell, Mr. Mauer and Dr. Jay Levy. Russell sought removal of Mrs. Levy's agents and curators, restoration of fees paid by Mr. and Mrs. Levy to the third party defendants, payment in the amount of $1,000,000 for Russell's damages for intentional infliction of emotional distress; additional damages for Russell's loss of reputation and good name, costs and fees and legal interest.
On 26 April 1999 Mr. Rosen and the Locke firm filed a dilatory exception of improper cumulation of actions and a peremptory exception of no cause of action to the third party demand. On 27 May 1999 Mr. Mauer filed a peremptory exception of prescription, dilatory exception of improper cumulation of actions and peremptory exception of no cause of action to the third party petition. On 11 June 1999 Dr. Jay Levy filed a dilatory exception of improper cumulation of actions and peremptory exception of no cause of action to the third party petition. On 23 July 1999 the trial court granted the exceptions of no cause of action filed by Mr. Mauer, Mr. Rosen, the Locke firm and Dr. Jay Levy, and dismissed the third party demand with prejudice.
On 17 January 2001 Russell moved to consolidate the instant case with his grandparents' interdiction proceeding and Mr. Levy' succession, all pending in Civil District Court for the Parish of Orleans. Following trial on the merits on 22-23 January 2001, the trial court rendered judgment on 25 July 2001 denying Russell's exception filed on the morning of the trial and ordering payment by Russell to Mr. Rosen as curator/executor in the amount of $530,768.59 plus interest and costs.
On 1 August 2001 Russell moved for a new trial. On 27 September 2001 Russell filed a motion for devolutive appeal of the judgment of 25 July 2001, which the trial court granted. Mr. Rosen included in his appellate brief a request for costs and fees incurred in defending against Russell's allegedly frivolous appeal; however, the record does not contain an answer to the appeal requesting these damages.
Having considered the arguments of counsel and having reviewed the record as a whole, we affirm the judgment of the trial court and assess the costs of this appeal against the appellant, Russell D. Levy.

STATEMENT OF FACTS
This is essentially a fact-intensive case, turning on the authority vel non given by Mr. and Mrs. Levy to their grandson, Russell, for the administration of their affairs during a finite time period. On 2 February 1994, Mr. Levy signed an Act of *645 Procuration severally in favor of his wife, Leonie Levy, his grandson, Russell, and attorney Charles Rosen II. The Act provides in pertinent part:
I expressly authorize my attorney-in-fact, other than my spouse [i.e. Leonie Levy] and grandchild [i.e. Russell] of mine, to make gifts on my behalf to my spouse, children and other descendants and the spouse of any child or other descendant, ...
The Act thus specifically provides that only Mr. Rosen would have authority to make gifts on behalf of Mr. Levy to Mr. Levy's wife, children, other descendants and spouses of descendants. This authority to make gifts was denied to Mrs. Levy and Russell. On 15 August 1995, Mr. Levy executed a notarial act revoking that Act of Procuration. On 18 August 1995, Mr. Levy executed a power of attorney naming as his agents Mr. Rosen and Jay M. Levy, M.D. On 5 January 1996 Mr. Levy executed a notarial act appointing as his agents Mr. Rosen and Edmond A. Mauer.
On 2 February 1994, Mrs. Levy signed an Act of Procuration severally in favor of Mr. Levy, Russell and Mr. Rosen. This Act contained a provision identical to that contained in Mr. Levy's Act limiting to Mr. Rosen the authority to make gifts to members of the Levy family and their spouses. On 15 August 1995, Mrs. Levy executed a notarial act revoking that Act of Procuration. On 5 January 1996, Mrs. Levy executed a Power of Attorney naming as agents Mr. Rosen and Mr. Mauer.
Mr. Rosen testified at the trial that he had practiced law for fifty years, and that Mrs. Levy was his aunt, and Mr. Levy was his uncle by marriage. He testified that he prepared the Acts of Procuration executed by Mr. and Mrs. Levy in February of 1994. Dr. Jay Levy and his brother Dr. Russell Levy, sons of Mr. and Mrs. Levy, contacted Mr. Rosen in fall of 1993 to assist in preparation of wills for their parents and to attempt to organize the parents' assets. In November 1993 he met with Mr. and Mrs. Levy, Dr. Jay Levy and defendant Russell Levy about the wills and estate plans. Mr. and Mrs. Levy executed their wills and powers of attorney in Mr. Rosen's office on 2 February 1994. Russell was living in his grandparents' home at the time. Mr. Rosen testified that he recommended execution of the powers of attorney because his clients were elderly and there was a distinct possibility that they might become incapacitated in some form and it seemed wise to have them create reciprocal powers of attorney in favor of each other and both Mr. Rosen as family counsel and their grandson who at that time represented that he was handling many of their household affairs. According to Mr. Rosen, who drafted the documents, the powers of attorney prohibited gifts by any of the agents to themselves or to their siblings or other relatives. Over his years of experience, he concluded it was unwise for agents to be able to make gifts with respect to an estate planning to themselves without some consultation from others. Mr. Rosen testified that although this is not a standard provision, he often inserted it in the powers of attorney he drafted.
Mr. Rosen testified that at the time the powers of attorney were executed Russell was single. A year or two later, it was represented to Mr. Rosen that Russell had married, but later he learned that the marriage never took place. Mr. Rosen testified that at that time Mr. and Mrs. Levy had their primary banking and securities accounts at Premier Bank and Premier Securities, but a great many of their assets, in the form of stocks and bonds, were held in a Whitney Bank safe deposit box. He and Russell went to the bank box after *646 execution of the powers of attorney and made a partial inventory. Russell agreed to go back to the bank box, make a complete inventory of its contents and send a copy to his uncle, Dr. Jay Levy, and to Mr. and Mrs. Levy. To Mr. Rosen's knowledge, Russell did so.
In the summer of 1995, Dr. Jay Levy called Mr. Rosen, and based on that call, Mr. Rosen went immediately to Premier Bank and under authority of his power of attorney asked to see copies of Mr. Levy' and Mrs. Levy's securities accounts. It was apparent to Mr. Rosen that suspect transactions had occurred between February 1994 and summer of 1995. Mr. Rosen noted an order transferring $40,000 in securities to accounts in the names of Russell D. Levy or Elizabeth Ballew at Dean Witter's office in Atlanta, Georgia. To his knowledge, Mr. and Mrs. Levy did not have accounts at Dean Witter at the time. Mr. Rosen immediately returned to his office and prepared a writ of sequestration and filed the instant lawsuit. The sheriff seized the securities in the hands of the bank and ultimately the securities were recovered for Mr. and Mrs. Levy. In order to prevent further transfers of assets, and because he believed it was his fiduciary obligation as counsel to the grandparents to revoke Russell's procuration, Mr. Rosen prepared and had executed revocations of the grandparents' powers of attorney.
After family consultation and receipt of several recommendations, he contacted Edmond Mauer, a Certified Public Accountant, to perform a recapitulation report of the grandparents' account using records that became available to him and were made available by Mr. and Mrs. Levy's son, Dr. Russell Levy. Mr. Mauer was to examine all bank records and security accounts and report his findings to Mr. Levy and to Mr. Rosen.
Under cross-examination, Mr. Rosen testified that Mr. Mauer had been recommended by Larry Israel, whose mother is Leonie Levy's sister. Mr. Rosen gave no particular reason why neither he nor Mr. Levy recommended that Mr. Levy' regular accountant, Jack Dienes, perform the recapitulation.
Mr. Mauer performed his recapitulation and furnished a written copy of the accounting showing that approximately $550,000 went to Russell and to Elizabeth Ballew, net of the $40,000 in securities seized under writ of sequestration. Mr. Rosen testified that Russell has not made any restitution or paid any of the approximately $550,000 to his grandparents.
Mr. Rosen testified that the Mauer recapitulation also reflected gifts in kind and in cash to Dr. Jay Levy (Russell's uncle), Dr. Russell Levy (Russell's father), Russell's brother Kevin and sister Jill and Mr. and Mrs. Levy's granddaughter, Augusta Levy. To the best of Mr. Rosen's recollection, most of the family members, with the exception of Russell, returned the assets to the estate.
On cross-examination, Mr. Rosen testified that after the family received the recapitulation, and Mr. Mauer became better known to Mr. Levy, Mr. Levy employed Mr. Mauer to run the household and pay the household employees.
On cross-examination, Mr. Rosen testified that both Mr. and Mrs. Levy were competent at the time they signed the powers of attorney and the revocation documents. Russell's deposition verifies that he was present and that his grandparents were competent at the time the powers of attorney were executed. At the time she signed the act of revocation, Mrs. Levy had suffered a stroke, but Mr. Rosen believed she could understand its provisions, which he explained to her. Mr. Rosen also denied that Mr. Levy at any time gave him *647 an explanation for the transfers made by Russell.
Edmond Mauer testified that he has been a Certified Public Accountant for fifteen years and is licensed to practice public accountancy in the State of Louisiana. Currently a sole practitioner, he practiced previously with the firm of Laporte, Sehrt, Romig and Hand, and is a member of the American Institute of CPAs and the Louisiana Society of Certified Public Accountants. He has been accepted as an expert witness by Judges Max N. Tobias and Robert A. Katz in Civil District Court and has never been denied expert status as a CPA in any Louisiana court. The trial court accepted Mr. Mauer as an expert in the field of public accountancy. Defense counsel did not object to this ruling.
Mr. Mauer confirmed that in September 1995 Mr. Rosen met with him and asked him to determine the amount of funds spent out of the checking and security accounts belonging to Mr. and Mrs. Levy. Dr. Russell Levy provided the checks, cancelled checks, securities account statements and bank statements. Family members and household employees gave him letters and other supporting information to confirm what was on the checks. He prepared a report categorizing each expenditure according to the notation on the check that was written when the check was written. He also made note of an ATM/automatic withdrawal program with Premier Bank called "Check Smarts" that offered a debit card. The bank statement reflects where the card was used. Out of town charges were coded to Russell, since he was the only authorized user who left the state of Louisiana during the relevant time period. According to this code, expenditures were credited as follows:

Code Number For Benefit Of $Total
503 Russell D. Levy $452,318.20
511 Elizabeth Ballew (Levy) $ 56,230.63
521 Russell and Elizabeth $ 32,620.00
519 Sallie Mae $ 9,599.76

Mr. Mauer testified that # 503 included a monthly fee of $1,000 that Russell paid to himself as compensation for his services as Mr. and Mrs. Levy's agent. Code # 511 represented checks written to Elizabeth Ballew (Levy) by Russell as well as Russell's transfers of his grandparents' stocks to Elizabeth. Code # 521 reflects stock transfers made by Russell jointly to himself and to Elizabeth from his grandparents' assets. Mr. Mauer testified that he knew Russell made the stock transfers because, according to Premier Bank, only Russell had authority to do so. Code # 519 reflects a payment Russell made to Sallie Mae, a federal program providing school loans. Mr. Mauer did not charge Russell's account with any funds transferred to other family members. The trial court admitted into evidence the coded recapitulation report as well as the original checks and certified copies of bank and securities statements supporting the recapitulation report. The report also shows that Mr. Mauer gave Russell credit for $29,700 paid to Dr. Russell Levy for Mr. and Mrs. Levy's expenses.
Mr. Mauer testified that he prepared Mr. and Mrs. Levy's tax return for 1995, and included the unauthorized transfers as a theft or casualty loss. Pursuant to federal law, Mr. and Mrs. Levy must attempt to recoup the loss, and are doing so by means of the instant lawsuit. Mr. Mauer also testified that most other members of the family repaid the amounts Russell had transferred to them, less a $20,000 annual non-taxable gift to each. Dr. Russell Levy owes approximately $80,000 and Kevin Levy owes approximately $100,000 to the Levy estate. Mr. Mauer testified that during the approximately eighteen months that Russell managed Mr. and Mrs. Levy's estate under the power of attorney, the Levys' securities account shrank from *648 about $2,000,000 to about $770,000 to $900,000. In Mr. Mauer's opinion, the Levys' estate could not have withstood a continuation of that spending level.
Dr. Russell Levy testified that when he discovered in late summer of 1995 that his son Russell had given himself over half a million dollars from the Levys' estate, he was not happy and was upset.

STANDARD OF REVIEW
In reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error. Hill v. Morehouse Parish Police Jury, 95-1100 p. 4(La.1/16/96), 666 So.2d 612, 614. "Where a fact finder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
FIRST ASSIGNMENT OF ERROR: The trial court erred in denying Russell D. Levy's peremptory exception of no right of action and in characterizing the exception as one of no cause of action.
At the commencement of the trial, the trial judge noted that Russell filed a peremptory exception of no right of action that morning that would be referred to the merits. In the judgment, the trial court denies as untimely filed an exception of no cause of action.
Since the peremptory exception may be considered at any stage of the proceeding prior to submission of the case for decision under LSA-C.C.P. art. 928(B), we have reviewed Russell's exception to Mr. Rosen's right to bring this action.
As executor of the Succession of Jacques Levy and Curator for Leonie Levy pursuant to her interdiction proceedings, Mr. Rosen's rights in the premises derive from the right of Mr. and Mrs. Levy to have filed the original lawsuit. The original petition was verified by one of the original plaintiffs, Jacques Levy. There is no evidence of record that, at that time, Mr. and Mrs. Levy were incompetent to file the suit or that this filing constituted fraud or ill practice. The trial court accepted the documentation substituting Mr. Rosen for his clients. We find no legal or credible evidence suggesting that the fact finder was manifestly erroneous or clearly wrong.
This assignment of error is without merit.
SECOND, THIRD AND FOURTH ASSIGNMENTS OF ERROR: The trial court erred in failing to disqualify Edmond Mauer as an expert witness and in accepting Mauer's testimony and characterizations of transactions.
A trial judge has wide discretion in determining whether to allow a witness to testify as an expert and his judgment will not be disturbed by an appellate court unless it is clearly erroneous. Becnel v. Lafayette Ins. Co., 99-2966, pp. 7-8 (La. App. 4 Cir. 11/15/2000), 773 So.2d 247, 251, writ denied XXXX-XXXX (La.2/9/01), 785 So.2d 827.
Russell contends that Mr. Mauer should be disqualified as an expert because he was hired to administer the Levys' affairs under joint powers of attorney dated 5 January 1996 naming him and Mr. Rosen as attorneys in fact; because he had a three-month intimate relationship with one of Mr. Levy's granddaughters; and because he did not ask Mr. or Mrs. Levy if they had authorized any of Russell's transfers and expenditures.
We cannot say from the evidence in this record that the trial court was manifestly erroneous in allowing this Certified Public Accountant to testify as to his categorization of Russell's expenditures. Indeed, Mr. Mauer did not venture into complex *649 accounting principles in giving his testimony. The checks that were introduced into evidence bear Russell's own contemporaneous notations as to their purposes. It does not require an expert to infer from the fact that Mr. and Mrs. Levy were essentially homebound during the time in question that purchases made out of state were not for their use. Likewise, it was clear that neither Mr. nor Mrs. Levy used the automobiles Russell purchased for himself during the course of his administration of their estate. Thus, Mr. Mauer's "expert" testimony is based on simple and regular accounting principles. We cannot say that the trial court was manifestly erroneous or clearly wrong in determining that it would accept Mr. Mauer's evidence.
The fact that after completion of his report Mr. Levy hired him to manage his affairs, or that subsequent to completion of the report he engaged in a intimate relationship with one of the Levy granddaughters does not reflect on the accuracy of his recapitulation report. The trial court was made aware of these alleged conflicts and, we infer, took all relevant facts into consideration before assigning credibility to this witness.
This assignment of error is without merit.
FIFTH ASSIGNMENT OF ERROR: The trial court erred in ruling there was sufficient evidence on which to base its judgment absent testimony from Jacques or Leonie Levy that Russell Levy did not have his grandparents' authority to make the transactions at issue in this case.
The trial court found in its reasons for judgment:
It is evident that these people [Mr. and Mrs. Levy] granted their grandson this authority because they trusted his abilities. As mandatary, Russell D. Levy owed a fiduciary duty to properly maintain [sic] and manage his grandparents' estate and its affairs. In granting these egregiously excessive gifts to himself and to his family members, this Court finds that Russell D. Levy violated that duty.
The trial court correctly noted that a mandatary is bound to restore to his principal whatever he has received by virtue of his procuration. LSA-C.C. art. 3005. Furthermore, the mandatary must pay interest on sums belonging to the principal that the mandatary converts to his own use. Thus, by law, the trial judge found Russell was required to restore the assets he converted and is answerable for interest on any sums he employed for his own use from the time he has so employed them and for that of any sum remaining in his hands from the day he becomes a defaulter by delaying to pay it over. LSA-C.C. art. 3005.
The trial court accepted Mr. Mauer's testimony as to the categorization of the various expenditures Russell made from his grandparents' estate, and properly subtracted from this sum the mandatary fee of $1,000 per month to which he was entitled. The court correctly began calculation of the fee on 2 February 1994, when the Levys executed the original procurations, and terminated the fee on 15 August 1995, the date Mrs. Levy revoked the mandate. As we have noted in our statement of facts, the documentary record taken together with the testimony of Mr. Rosen and Mr. Mauer, both of whom were accepted by the trial judge as credible witnesses, amply supports these conclusions.
We note that Mr. Levy departed this life before the trial of this matter and so was not available to testify. Furthermore, the evidence was unequivocal that Mrs. Levy was incapacitated to such an extent that she would not be able to testify at *650 trial. However, it is abundantly clear from the record that the Acts of Procuration and of Revocation of Procuration in evidence speak for themselves. Russell did not offer evidence that he had his grandparents' authority by any vehicle other than the original Act of Procuration to make the transfers to himself and to other Levy family members, and his deposition is devoid of any mention of a basis on which the transfers could be deemed to have been authorized by Mr. and Mrs. Levy. The trial court's acceptance of Mr. Rosen's and Mr. Mauer's testimony as convincing and his review of the supporting documentation concerning the limitations on Russell's power to alienate his grandparents' assets and the categorization of Russell's expenditures and asset transfers is not manifestly erroneous or clearly wrong.
This assignment of error is without merit.
MOTION FOR DAMAGES FOR FRIVOLOUS APPEAL
Mr. Rosen characterizes Russell's appeal as frivolous and seeks to recover the costs incurred in defending the appeal. This Court may, in an appropriate case, award damages for frivolous appeal. LSA-C.C.P. art. 2164. Appeals are favored, and damages for frivolous appeal are granted only when clearly due. Charleston v. Berry, 97-2527 (La.App. 1 Cir. 12/28/98), 723 So.2d 1069. Furthermore, because an award of such damages is penal in nature, we must construe the issue strictly in favor of the appellant. Christoffer v. New Orleans Fire Dept., 99-2658 (La.App. 4 Cir. 3/15/2000), 757 So.2d 863.
This Court has granted such damages upon a clear showing that the appellant's purpose in prosecuting the appeal was to delay the action or that counsel did not have a sincere and serious belief in the legal position advocated in the appeal. See Hester v. Hester, 97-2009 (La.App. 4 Cir. 6/3/98), 715 So.2d 43.
Applying the rule of strict construction against Mr. Rosen's motion, we conclude there has not been such a clear showing that Russell's assignments of error, while not persuasive legally or factually, have been interposed solely for the purpose of delaying the litigation. There is a strong suggestion that Russell has insufficient assets from which to satisfy the judgment, so that he has little to gain by delay. Furthermore, in both brief and appellate hearing, counsel for Russell appeared to be serious and sincere in his argument.
We therefore deny Mr. Rosen's motion for damages for frivolous appeal.

CONCLUSION AND DECREE
For the foregoing reasons, we affirm the judgment of the trial court and assess the costs of this appeal to the appellant, Russell D. Levy.
AFFIRMED.
NOTES
[1] The pleadings allege that Elizabeth Ballew was at the relevant time the wife of Russell D. Levy, and the parties treat her as such in their appellate briefs. Charles Rosen II testified that he has subsequently learned that there was no marriage. Since neither party has argued that Elizabeth did not enjoy the status of "spouse" within the meaning of the Acts of Procuration at issue herein, we shall consider her as the spouse of a Levy descendant.